Hear ye, hear ye, this Honorable Appellate Court for the 2nd Judicial District is now open. The Honorable Susan F. Hutchinson presiding. Good morning and please be seated. Your Honor, the first case on the docket this morning is 2-23-0174 N. Ray, the State of Marcells, Stinnette, D.C. The Fowler Williams Parents of the next friend of MCS, a minor pair of D.C. Responding across Petitioner Appellant, the Tarbellas Plains Petitioner Appellant. Arguing on behalf of the Appellant, Mr. Frederick Lester. Arguing on behalf of the Appellant, Mr. Donald J. Morrison. Good morning, ladies and gentlemen. And Mr. Lester, when you are ready, you may proceed. Thank you, Your Honor. May it please the Court, my name is Frederick Ryan Lester. I'm here on behalf of the Counterpetitioner and Appellant, Taffaro Williams. The Court has received extensive briefing on the appeal. Not only the regular briefs, but also the Court requested and parties filed supplemental briefs on articles, I'm sorry, sections 9-1 and 9-3 of the Probate Act. I will do my best not to belabor or repeat all of those arguments here today. I'm just curious, Mr. Lester, why weren't those issues addressed initially?  I will tell you, I'm here for the oral argument. I was not participating in the brief, so I don't have any personal knowledge of that. But I think that the parties on both parts were focused on more broad issues, rather than my bread and butter, which is 9-1 and 9-3. But the statute's the statute. It seems like it should be at least acknowledged in some way in the initial briefing. And again, you didn't do it, so I can't blame you. And I certainly let me apologize on behalf of our side. At least if we did not address the key issue to the Court, we are glad to have done the supplemental briefing and we are glad to address it today. There are three points that I wanted to highlight, stress today. The first is the appellee repeatedly conflates the concept of nomination with appointment. As if the right to nominate was somehow absolute, that is not, the law never has been. 9-1 sets forth the qualifications for someone to be an administrator. They're fairly simple qualifications. And 9-2 sets out that people can file a petition seeking appointment of an administrator of an intestate or state such as this. And 9-3 sets forth a series of preferences. Preferences for a nomination. And that's kind of the key. It's one of the cases that was cited by State of Morrissey, highlighted absent adverse interest or hostility, the preference should be followed. But, of course, the Court needs to hold an evidentiary hearing, hear testimony, receive evidence when there are counterpetitions. Mr. Lesser, was this case up for hearing on that date? No, this case was scheduled for steps. We had been litigating this case for over two years at that point. And there were the two cases, they were not consolidated. There's the minor's estate, a guardianship estate, which was 885, and there was the decedent's estate, this estate. And we were scheduled on May 1st, my birthday, to appear for a decision in the guardianship proceeding. So the petition for guardianship was pending when the Court appointed Holmes as the administrator. Correct. Not only pending, Your Honor, but we had a hearing, an evidentiary hearing, a trial scheduled for two, three weeks after that. For the guardianship? For the guardianship, in the guardianship, correct. Because certainly the proper procedure under 9-3 is for the Court to first appoint a guardian. The guardian then has the right to nominate the administrator of the decedent's estate. And the Court would then hold a hearing or, if there is no counter, appoint the nominated administrator. But the Court could hold a hearing and should, when there are cross-petitions, hold a hearing, hear the testimony of the witnesses, allow cross-examination. Well, it seemed as though the Court was a little bit confused with the terms. Yes. The colloquy, I'm sure Your Honor has read the colloquy in the transcript. It is incredibly confused. The Court confused my client. At one point she announces that she's granting the petition of Tomorrow Williams. Confused my client with the counter-petitioners of Ellis Holmes. She confused administrator. Administrator and guardian. She confused the decedent with the decedent's son. And it is a very sloppy colloquy or ruling, if you will, from the transcript alone. And I think that's because the Court reversed the order in which it both had previously been acting. We had been actively litigating, and you can see we broke the record. The decedent's estate, you see order after order saying continued, continued, continued. That's because we were actively litigating in motion practice the guardianship. And we were proceeding to appoint and have a guardian appointed because the guardian then acting on behalf of the minor child. Because the minor child is the one who has the right to nominate. May I ask, what's the current status of any of the guardianship? It's stayed now. It's on hold. The federal court cases are on hold pending the criminal. The raffle death cases. Yes, the raffle death case is on hold, and now the guardianship is on hold as well. Of Marcellus Jr.'s guardian of the estate, that's stayed? Correct. That is currently stayed. So, you know, the Court jumped ahead and appointed the administrator without having any guardian appointed to act on behalf of the minor child. Now, I have a question for you. There is a guardianship report that was filed by Mr. Kopsik, and that came in well after she had appointed the administrator. Yes. She appointed the guardian in the guardianship on the same day at the same hearing. I sound like her. You say you saw the transcript. So, should we take that into consideration? Why did the fact that it came in after the decision? No, the Court should not take that into consideration. And that's a report that was never subject to cross-examination. The guardian did not testify. He simply issued his report on his opinions about a month and a half after. This case was already on appeal before that report was ever prepared or filed. And that's why there was a motion to supplement, I assume, our record since this case was already on appeal. We did not do that. No, I know that. We did not do that. But, yes, they've submitted that. We think the Court should not consider that. Certainly, the circuit court did not consider that and did not have that report in front of the Court on May 1st. You also argued in your briefs, I think it was Section 1-2.11 of the Probate Act, wherein you felt that Mom, Mrs. Holmes, would have to have an interest in the estate in order to be appointed administrator. Yes, thank you, Your Honor. That was my second point. Does it require her to have an interest? Yes, we believe so, Your Honor. We've cited cases in the briefs that stand for that proposition. Indeed, standing is a requirement in all civil litigation. You have to, in order to come close. Well, standing and interest are two different things, really. Well, they're closely related. They may not be identical, but they're really close. But Article 9 of the Probate Act, which applies to letters of administration, doesn't require an administrator to be an interested person. No, the administrator does not have to be an interested person. However, the person who nominates the administrator does have to be an interested person. Quite often, Your Honor, banks are appointed as guardians of estates or as administrators of estates. The bank is not an interested person, but the person who nominates the bank, who asks for the bank to be the administrator or executor, is an interested person. That's kind of the key. But she is interested. It's just that she's lower in the preference. Thank you, Your Honor. No, we do not believe she's interested at all. She is not an heir. The intestate statute, 2-2, is very clear. When somebody has a child, the child is the heir. Their parents are not heirs. Their siblings are not heirs. They take nothing from the estate. They have no financial interest in the estate at all. And that is one of the problems here in that she should never have been allowed to proceed in this case because she has no role there. I do realize that there are emotional interests. I think the law has recognized that forever. But legislature has to draw a bright line in terms of who takes the estate and did that. And those are the people who are, that is, the heirs at law are the people. What about the state of Zincus? Doesn't that, and, you know, I don't want to quibble about it, but isn't that a case where the natural mother of the child was named administrator over family members of the deceased father? Yes, Your Honor. Zincus is a good case for this. Yes. The, I think it was the, oh, the cage is the one with the sister. But it's not this. As far as I could tell, she wasn't guardian. Well, that I can't, that I'm, I can't answer for you, Judge. But I will try to get you, I will get you, I will get you an answer on that. The key is I can't, for example, see, sit in the probate court and, or read the paper, hey, this is an interesting person who passed away. I like this obituary. I want to go in and open up an estate for this person, for the decedent, and find out more about their lives or administer their estate. I can't do that. If I do that, if I file the petition, the court should dismiss that because I have no interest in it. And interest is defined under the Probate Act. Interest to nominate. But isn't it true that the trial court could have, had she been named guardian of the minor's estate, could have considered the nomination as that of the minor's child, but then decided for whatever reason they were not, the trial court wasn't going to honor the nomination of herself or her nominee, depending on whether she is unsuitable, conflicted, has an adverse interest, maybe even just hostility generally to other heirs. I mean, ultimately, it's not a be-all, end-all, trump card. Absolutely, Your Honor. Your Honor is entirely correct. It's something the court can do it for no reason. The court has to have, of course, and the court should always have a reason, a logical reason. And the state of mercy that I just cited a moment ago stands for exactly that proposition, that absent adverse interest or hostility, the preference should be followed. But the court should consider adverse interest or hostility. The court can consider conflicts of interest. Absolutely. The court can consider the nominated administrator has declared bankruptcy. The court can consider that they are hostile to the heirs. The court can consider pretty much, you know, whatever, I'm sorry, any logical reason why the person would be an inappropriate selection for a fiduciary. Now, in this case, Your Honor, we never had any opportunity to cross-examine Zarbella's home. The court knew nothing about her qualifications. There's nothing in the petition that says that she's had any experiences she had with lawsuits, what experiences she had as a fiduciary, what experiences she had handling money, what is her relationship with the minor, none. It is the court never considered any of these were allowed to borrow Williams to testify about them. Because you didn't have an hearing. Correct. There was no hearing. There was no trial. We simply showed up for status. We showed up, of course, when we were active in the guardianship, but on the decedent's estate. And the court is, I was quite shocked, frankly. I hate to admit it. We lawyers never want to say that we're surprised by anything. But I was surprised. Suddenly, out of the blue, the court announced that this was the easier of the two cases and therefore made a decision without hearing any testimony or any opportunity to cross-examine, present any information. We had intended in the guardianship estate to present a representative from the Chicago Trust Company to testify about their services and their procedures and how they act as a fiduciary and their experience and the importance of investing money and all of these topics. The court never heard any of that. If the natural mother, it becomes, and excuse me, this is a little off your topic, but if, and I understand there's a pending felony, if that becomes a conviction, then what? She can be removed. The statute 23-2 provides that if a representative is appointed and the representative is subsequently convicted of a felony, that is grounds for the representative to be removed, of course, and should be. However, Tafara Williams has not been convicted, may well never be convicted, could be put down to a lower, I mean, all kinds of things, well, I'm telling you this court, all kinds of things can happen between an indictment and a conviction, then what happens? My apologies, I'm over time, and I would like to do my five minutes rebuttal. Thank you. Thank you, counsel. Mr. Morrison. Thank you. May it please this honorable court, counsel, counsel, Ms. Holmes. I want to touch on three major topics, and the first is the fact that at the time Judge Fix entered this order on May 1st, there was ample evidence in the record of an obvious, unavoidable, undeniable conflict of interest. I've been reading the record. Tell me exactly what you think that conflict is. The conflict is the fact that Tafara Williams admittedly, on the night in question, left her house with her children in bed, went outside in front of their apartment, got into the driver's side, the driver's seat of a motor vehicle with Marcellus Stinnett in the passenger seat. And by the way, this is taken from the record from the complaint at law that she filed in federal court, which was referred to in the arguments in the report of proceedings on April 27th, and is a document that is in the public record. So she then, in the complaint, says a police officer pulled up next to her. The police officer got out of the vehicle. The police officer spoke to them. The complaint says the police officer knew our names, so the police officer getting out of the vehicle, speaking to her. We have her admitting that she took off. She fled the scene. She admits that at some point there was a police chase. She backed her car up in the area where Mr. Salinas was, so that at the tail end of that police chase, Officer Salinas fired several weapons into the car, injuring her and killing Marcellus. That's in the record, and those are her words. That's true, but Section 9-1 says anyone talking about administrators, anyone who attains the age of 18, is a U.S. resident, or a convicted felon is disqualified. Correct. Or is disqualified, or is qualified. She's not a convicted felon. But if you're all of those things, you're qualified. If you're accused of a crime, whether she, whether you think there's proof beyond a reasonable doubt based upon her statement or not, that's not what the statute says. They have to be a convicted felon. Correct. And as Mr. Lesser says, should she subsequently become convicted, she can be removed, correct? Correct. Doesn't the mother take preference under 9-3 over the grandmother? No, because Section 9-1, as we argue in our brief, sets the floor, not the ceiling. Those are statutory requirements to be eligible to act or to nominate. But there's nothing in that section about a non-interested person, is there? That's where we get into the case law of the Savio case and the Storrow case, which sets, which clearly states that despite the statutory preference in 9-3, if you are not qualified to act, and it doesn't say statutory qualified, you can be not qualified to act because of hostility or other reasons. This is because at the moment she filed her petition, her original petition saying, I'm Taffar Williams, I want to be the executor of this estate or the administrator of this estate, where the sole asset is the cause of action. And there are facts that intrinsically link you to that cause of action. It doesn't matter whether she's guilty beyond a reasonable doubt. It doesn't matter whether she's indicted or not indicted. The indictment is another piece of evidence, though, that Judge Fitts had that she relied upon and said, okay, this is more evidence of her conflict of interest, of her involvement. There's one piece missing in the complaint that you're, at least in my mind, this complaint in the suit that's missing. So she, the police officer knew our names. Why? That's not in the complaint. That might set the stage, and it's not there. And we've never had a hearing about what she thought when the police officer knew their names. She just left. And that is a critical piece of evidence that we don't have, no matter how long you litigated this case. And that's true. We don't have whether or not she's going to be convicted yet. We don't have proof that she's guilty beyond a reasonable doubt. But in the cases like the Storer case, in the Storer case, that's the husband that's driving, wife is the passenger, wife is killed in an accident, it's a head-on collision, it's on the crest of a hill, the only evidence is it happened somewhere in the middle of the road, right? So no one's saying that that husband is at fault. It's that he was, he is an actor that is involved in the process, and somebody could take the position that you are involved. And if he's the plaintiff, if Taffaro Williams is the plaintiff, or has a hand in saying who gets to be the plaintiff in the wrongful death case. And as Joaquin and the police officer said in their initial joint status reports, they may name her as a defendant in the case. At the very least, she could be the subject of a sole proximate cause defense. Maybe, isn't it? Isn't the time passed? Well, I mean, I'm not here to say whether or not the statute of limitations would apply if someone in the federal case were to try to do that. Because there's a state, is that total statute of limitations? We have a minor of the interested party that could extend the statute of limitations. I don't know the answer to that. But I know that when you look at the Savio case and the Storer case, those cases, they weren't saying, even in Savio, they didn't say, Drew Peterson, you're a murderer. They said this. They said it's clear he could be the subject of a wrongful, the defendant in a wrongful death case. And in the Storer case, it was a little more subtle. But he had actually tried to settle the case, didn't he, for a certain amount of money. Correct. He came in, objected, that's not enough. I think it was the guardian that lied to him. And they subsequently appointed the bank. He remained to, if I'm reading it right, the administrator of the estate. After the appellate court ruled, the appellate court just said, he's not going to handle the lawsuit anymore. I think they appointed the bank's special administrator under the Wrongful Death Act. Correct. And they remanded to say they don't have to take it. He didn't have anything to do with these lawsuits. Exactly. He had, yeah, they use the term impossible conflict of interest. And I think that might be the first time I noticed a court using that phrase. But here, he died of a gunshot wound, didn't he? He died of a gunshot wound that never would have, arguably. And I'm not, we're not here to point the finger at the far world and say you're guilty, you're responsible, okay. We're here to say that this never would have happened, causally, had you not taken off from the police. And we have her saying that she, her admitting that she did it. We have a Lake County jury, a grand jury that found probable cause. The Guardian-Lytton report, admittedly, that was afterwards. So Judge Fix couldn't have had knowledge of what the Guardian-Lytton might do. But again, here's another piece of evidence that says, here's an independent person looking at this saying, there's a conflict of interest. She should have nothing to do with the awful death case, so she shouldn't even get to be guardian. But Mr. Morrison, these are all great arguments, both yours and Mr. Wessler's arguments. However, do we even get here when there was not a hearing? This case wasn't up for hearing. There was no evidentiary hearing, no testimony taken. There were no findings by the court under any of the probate acts or statutes regarding guardianship or administrator on that date. So is this a case that is premature, if you will, and that should perhaps be remanded to the trial court to hold a hearing? I would point to two cases, the Savio case and the Medina case, to answer that. And I would say that, so for instance, I'm just reading from the state of Savio case. This is at 902 Northeast 2nd, 1120 through 1121. Our review of this issue in the present case is complicated by the fact that at the hearing on the matter, no evidence was presented, only arguments. However, what was the case up for hearing on that date? In Savio, I don't know the answer to that. I can't escape that. It was not, this case was not up for hearing. Right. Should we assume that in Savio it was up for status, that the court just decided, you know what, I'm going to decide a lot today, not a little? So that brings me to the next sentence in the Savio case. However, no objection was made in the trial court by either side as to the manner of proceeding. Thus, at this point, any issue regarding the procedure followed in the trial court is forfeited. It goes on to cite the case of Dowell v. Kittner, 273 Illinois Appellate 3rd, 681, which stands for the proposition that each party has the obligation to raise and present its issues in the trial court, and the failure to do so will result in the forfeiture of those on appeal. Didn't you say on several occasions during this hearing, Judge, it's up for status? Didn't you say that? I'm not arguing. I can't argue with that. The case was up for status. And you, I think you were the one that kind of was pointing her to the fact that this is up for status. Yes. What I do know, the question is, I do know that when she ruled, I believe because she had the indictment, which was more evidence of this impossible competitive interest, and she realized that although there may be a fight as to who might have statutory preference, if the Catholic is there, that's going to trump any statutory preference. And then most importantly, she didn't leave the bench. She didn't storm off the bench. We had a colloquy. Mr. Lesser corrected her about the date of a petition on an amended guardianship position. We talked about scheduling. We appointed the GAL. We talked about when we could start contacting Mr. Papps. They knew that Mr. Lesser, both of us were acquainted with him. The judge set a deadline on when we could first contact him. At no point did Mr. Lesser say, objection, Judge, this isn't set for hearing. At no point did he say, I'm requesting an evidentiary hearing. There was one already set. There was a date already set. Why would he have, you know, there's a date set already. It's like three weeks in the future, right? Before we were setting dates, he said he was stumped, okay? He said he was surprised. He never opened, he forfeited this issue. He never gave the trial court, Judge Fix, an opportunity to. If it was error, and I don't believe it was error because I think there was enough evidence in the record. Do you have a case that says if the court has an indictment, a hearing isn't necessary? No. And again, the indictment is just more evidence that somebody looked at this case and said, she's got some responsibility here, okay? And the point is. No, she fled, but it doesn't say that she had responsibility. Well, you're right. And I should correct myself. The indictment is not an ag fleeing, eluding, calling death. Right. That wasn't, Mr. Reinhardt decided not to, I can't speak to his decision, okay? But this is a felony based upon two or more traffic signals. Good. I don't know why that decision was made. It doesn't relate in any way to the unfortunate death of Mr. Reinhardt. It absolutely related in every possible way because this never happens had she not taken off from the police. And the important thing is. Can I ask, the occurrence, the death, excuse me, was October 2020, correct? I believe so, yes. He said 2020 for sure. Right. The indictment didn't come down until 2022. Was there, were there non-traffics or a felony complaint before that? Just under investigation, ballistics, we have been, Paul Rogers' office and my office were in contact with Mr. Reinhardt throughout this trying to figure out what was delaying the process. I don't know. It happened two years later. The indictments came down against Officer Salinas and Tafari Williams two years later. The other important matter I want to bring up is that even after we left court that day, the first thing we heard was a notice of appeal. And you would think that under the doctrine of whether you call it waiver or forfeiture, I don't know whether this rises to the level of a knowingly, relinquishingly a known right or just failure to timely observe a known right. But not only does Mr. Russell not object at the time, he could have filed a motion to reconsider. Say, you know what, Judge, I've been doing this a long time. You're relatively new in the probate division. How about a hearing on this? Does he have to file a motion to reconsider? He does not have to file a motion to reconsider to perfect his appeal. But if there's no record of an objection to no evidence you're hearing, you should absolutely file a motion to reconsider to make sure that a court like you doesn't look at your actions and say, sorry, you forfeited it. The cases don't talk about an accident. Does the forfeiture, if there is one, bind us? Pardon? Does the forfeiture, if there is one, bind us? Well, again, I don't know whether it's a waiver or a forfeiture, but I certainly think that the cases, the Savio case and the — But is a forfeiture a limitation on the parties and not the court, Mr. Morrison? Well, now I'm getting a dissertation on a forfeiture. I'm not saying it's a dissertation. I'm asking. It's a form of forfeiture as a limitation on the parties, not the court. Correct? It's a limitation on the parties, but I think the court, as Savio and the case cited in there, the court can look at it and say, you forfeited this right because you never gave the trial court any type of reasonable opportunity, or in this case, any opportunity. Did Judge Fix refer to any of these cases in her decision? She did not directly refer to them, but I know that she had been there. I know that she had the Savio case because she referred to it. It's not on the record. Okay. You're not asking me to answer something that's not going to be on the record. I have — I know that time has lapsed, but I have a question. We're talking about a conflict of interest here. In the pleadings that I looked at and in the briefs, Ms. Holmes is calling this child a possible son. That is — I mean, she is trying to — that, to me, means she's trying to eliminate him, and that is a major conflict of interest. It's her grandson. Let me answer that question. Please. When this first case first came up, Kevin O'Connor was handling it on behalf of his other household. There was an affidavit of heirship and an order declaring heirship. He listed the Stennett family members. He listed Marcellus Stennett as a potential son. But he also said, and it's probably neither here nor there, but that everybody's been notified. I'm hearing my emergency petition, which was granted. Had Ms. Williams or Marcellus Jr., who I'm thinking was a toddler at the time, I'm not sure, been notified? Maybe. Or do you know? I know what the notice says. Put your hand down. Your client has her hand in the air. I asked her to put it down. I do not know the answer to that. Thank you. That's okay. But what I was — DNA wasn't established until after Holmes got the approval. He still needs to get the DNA. I haven't gotten the DNA. $10, please. I don't know what the problem is. I have the papers right here. And it tells me what the time. No DNA. Is that the truth? So, again, the DNA wasn't established until after Holmes got appointed administrator. So because — from all Kevin O'Connor knew, same name, but not on the birth certificate, no acknowledgement of paternity, and no DNA test at the time. This is the proof right here. Then, when the emergency motion from Tafaris came out, they said, you've only listed him as a potential son. I'm going to — I'm going to request — they requested the DNA test. They requested it. We never objected to it. It came in. It got sealed. We then said, okay, it is what it is. Let's move on and talk about the topic of interest. That's what we did. But the pleadings were never changed to reflect that, were they? Well, I think — well, the order to plan an airship was. There was a corrected order to plan an airship. Right. Yeah. Thank you so much. Thank you. Mr. Lesser, if you have some rebuttal, you may proceed. Thank you, Your Honor. Your Honor, all of the arguments, frankly, that counsel made might have been relevant and could have been heard had there been a trial, a hearing. Well, what's your response to what Mr. Morrison said, is that you stood mute and — Well, what are you looking for from this court? Remand. We would like the court to reverse and remand for a hearing on the, I think, first appointment of the guardian, but eventually a hearing on the appointment of an administrator in the estate. That is what we're looking for, the hearing that we wanted to have. Counsel says that I stood mute. Yes, I was surprised. The record is very clear. They had a petition for appointment of an administrator. We had a counterpetition that directly contradicted their petition. Their petition, by the way, alleges in Exhibit A, which is an important part of these records, as the court knows, that the heirs-at-law were Zarbella's homes and her children. That's the petition that was granted by the court. Even though the court, because as a result of the DNA evidence, which was submitted and all is in the record, the court had amended the order declaring heirship, finding that Marcella Seastead, the child, was the sole heir. And yet the court, in the end, granted the petition with a — not amended, not changed, just granted the petition. Part of the inconsistency in the record here is, okay, who's the heir then? Because the court then subsequently grants the petition with Zarbella's homes and her children as the heirs. These are technically two different court numbers, correct? Yes, correct. They were not consolidated, Your Honor. Right. And so you and Mr. Morrison and anybody else who has their hands in this know that they are related. But if I just went in, if I was an investigator and just pulled the STINET file as a — You have half the story. And you wouldn't know to look over here. Correct. Which is critical, I think, to this proceedings for purposes of lawsuit, case, whatever the situation is. I'm in agreement with Your Honor. And we had treated them — counsel both sides had treated these cases as if they were companion cases. But one's a minor's estate, the other one is a decedent's estate. We did not consolidate them because they are different purposes. And frankly, we all thought that at one point we'd get a guardian appointed and that we would then get an administrator appointed. And we would go on as separate estates as they really should be administered. But instead, the court simply ruled sua sponte. And the third point I wanted to make, by the way, was that what's really happened here was a breach of due process of law. That's really what, in many ways, this is about. The court, when it ruled, said, I cannot appoint an independent representative in that case either. No explanation. If there's a concern about conflict of interest, we had nominated the Chicago Trust Company to be the administrator of the estate, which would remove any conflict of interest, of course. And the court could have considered that, but the court didn't. The court simply decided that it could not appoint an independent representative. Never any explanation as to why. Did at one point she indicate that she had preference over an individual versus a bank? No. There's nothing in the statute, of course, that says that. The person with the preference can nominate a bank. Do it all up front. And that has, and the, I'll bear with you for a moment. The idea that the judge didn't know that we were objecting to this is contrary to the record and also completely, utterly false. Judge Fix was well aware of our position. We had argued it repeatedly both before, you can see the record. There were still pending directly contradictory positions. One last question, at least for me, and I'll ask my colleagues. On the day, May 1st, were there, you said you were ready to present certain evidence. How many witnesses did you have to do that? We looked for status on, in this case, on May 1st. We were also there in the guardianship case for a decision on our motion to stay the trial which was about to take place. We had anticipated at least three witnesses. But there weren't any subpoenas returned for this day for parties to appear, witnesses to appear. Oh, I'm sorry. In the guardianship, yes. We had issued subpoenas to the Chicago Trust Company. Okay. You know, we had done, I don't want to speak further because it's been a couple of years now. It's been a little while now. But, yeah, we anticipated having testimony from Tafara Williams on her qualifications, her relationship with her son, da, da, da, from the Chicago Trust Company on their procedures. On this day? No. The May day. On the May day. The later day, I think it was May 16th, was the. But I'm asking you. On May 1st, were there subpoenas returned in the file? Or had you not gotten that far? We had issued the subpoena. I don't know that they've been filed. I think it had been filed in the guardianship. We had given the subpoena to the Chicago Trust Company. I'm sure of that. All right. Justice Miller? Justice Chauvin? Nothing further. Thank you, counsel. Thank you, Your Honor. All right. Counsel, thank you very much for your arguments today. We appreciate them. This is a complicated case. And we are happy to have heard it. And we will issue a decision in due course. Thank you. We're going to stand in recess now to prepare for our.